

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-14-00297-CR

ARACELI GUZMAN                                                          APPELLANT

V.

THE STATE OF TEXAS                                                           STATE

----------

FROM CRIMINAL DISTRICT COURT NO. 2 OF TARRANT COUNTY
TRIAL COURT NO. 1324583D

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

Appellant Araceli Guzman was indicted for felony murder for the death of

Lily,[2] a seven-month-old baby entrusted to Guzman's care. A jury acquitted

---

[1]*See* Tex. R. App. P. 47.4.

[2]To protect the anonymity of the children in this case, we will use aliases to refer to some of the individuals named herein. *See* Tex. R. App. P. 9.10(a)(3);

Guzman of murder but found her guilty of the lesser offense of recklessly causing serious bodily injury to a child. *See* Tex. Penal Code Ann. § 22.04(a)(1) (West Supp. 2014). The jury assessed Guzman's punishment at twelve years' confinement, and the trial court sentenced her accordingly. In two points, Guzman argues that the evidence is insufficient to support her conviction. We will affirm.

## II. FACTUAL BACKGROUND

In April 2013, Lily was a seven-month-old baby living with her mother, Michelle, and two older sisters, eight-year-old Jennifer and two-year-old Kaitlyn. As Michelle worked during the day, she hired Guzman to watch Lily and Kaitlyn during the days she worked.[3] The arrangement called for Guzman to watch the girls at her Haltom City apartment, while she also took care of her own two children, ages two and three.

On April 22, 2013, Michelle dropped Lily and Kaitlyn off at Guzman's apartment around 6:30 or 6:45 a.m. Lily seemed fine when she was dropped off. In the early afternoon, however, Guzman called Michelle and told her that Lily was having difficulty breathing and that Michelle needed to come pick Lily up. Guzman then called Casey Neill, a friend who lived in the apartment above her,

---

*McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

[3]Jennifer, Lily's eight-year-old sister, was typically not watched by Guzman as Jennifer attended school.

2

to come down to the apartment to see what was wrong with Lily. Neill came over and noticed that Lily was "barely breathing, her eyes were rolled back in her head, and she looked like she was having a seizure." Neill then called Alicia Puente, another friend who lived in the apartment complex, to come over. When Puente arrived, she noticed that Lily was having difficulty breathing, her tongue was stuck to the roof of her mouth, and her legs were stiff with her toes pointed out. After Puente arrived in the apartment, Guzman called 911.

Lieutenant Terry Waters, a fireman with the Haltom City Fire Department, was dispatched to Guzman's apartment. Guzman told Lieutenant Waters that she had placed Lily on the floor to go and get a bottle, and when she came back, Lily was in distress. When Lily was taken inside the ambulance, Lieutenant Waters noticed a raised area approximately the size of "a quarter to a half-dollar" on her left forehead. Upon seeing this raised area, Lieutenant Waters went back inside the apartment and further questioned Guzman about the cause of Lily's injury. Guzman suggested to Lieutenant Waters that perhaps Lily had hit her head on a nearby dresser when Guzman had left the room to retrieve the bottle.

Shawn Nicholson, a paramedic dispatched to Guzman's apartment, examined Lily and found that she was having very significant changes in heart rate. He also noticed that she was experiencing decorticate posturing—a tightening of the limbs that is indicative of a traumatic brain injury. Nicholson also observed a golf-ball size hematoma on the left side of Lily's forehead. Nicholson testified that a bruise, like the one Lily had, would typically develop within

3

minutes of the injury. Nicholson spoke to Michelle on the telephone while he was examining Lily, and Michelle indicated that Lily had been "perfectly fine" when she was dropped off at Guzman's apartment. Guzman likewise told Nicholson that Lily had been fine when Michelle dropped her off.

Lily was taken by ambulance to Cook Children's Hospital, where she was treated by Dr. Richard Roberts, a pediatric neurosurgeon. A CT scan taken at the hospital revealed that Lily had a subdural hematoma and a mid-line shift—a shifting of the brain to accommodate swelling inside the brain. Due to the severity of Lily's injuries, she was quickly taken to the operating room for surgery. During surgery, Dr. Roberts removed part of Lily's skull and made small cuts in the dura to try to evacuate some of the blood that was causing pressure to build in Lily's brain. Dr. Roberts testified that he could not control the active bleeding in Lily's brain. The bleeding was so severe that he had to call another doctor into the operating room to help him try and stop the bleeding—something Dr. Roberts had never before had to do during surgery.[4] Dr. Roberts ultimately had to remove a portion of Lily's right frontal lobe due to the "tremendous amount of swelling" inside her brain.

Corporal Tony Miller of the Haltom City Police Department interviewed Guzman at her apartment on the day that Lily was taken to the hospital. Guzman

---

[4]Dr. Roberts testified that Lily was on massive transfusion protocol and had to be given over two liters of blood—approximately three times the volume of blood in her entire body.

told Corporal Miller that Michelle had dropped Lily off around 6:30 or 6:45 a.m. and that Lily had seemed normal. Guzman explained that as the day progressed, she fed Lily a bottle and then put her to sleep in a car seat in Guzman's bedroom. Guzman told Corporal Miller that the door to the bedroom had been closed, that the other children in the apartment did not go into the closed bedroom, and that no one had been in the apartment since Lily arrived other than Guzman and the children. According to Guzman, Lily woke up "hollering" around 12:00 or 1:00 p.m.[5] Guzman explained that she then took Lily out of the car seat, placed her on the floor, and went in the other room to make her a bottle. Guzman said that when she came back into the room, Lily was lethargic and having difficulty breathing. About halfway through the interview, Guzman indicated that she had accidently bumped Lily's head on a dresser while she was bending over to pick up an exercise bar while holding Lily.

Corporal Miller conducted a second interview of Guzman two days later.[6] Guzman again mentioned to Corporal Miller that she had accidently bumped Lily's head into a dresser but "figured . . . it was not that bad" and "didn't think it was a big deal." Guzman also indicated to Corporal Miller that she had slightly shaken Lily when trying to wake her up. Later in the interview, Guzman admitted

[5]Guzman told Corporal Miller that Lily "doesn't cry, she hollers."

[6]The first interview was cut short when word reached Corporal Miller that Lily's father had threatened to blow up Guzman's apartment complex. Lily's father was subsequently arrested and charged with making a terroristic threat. During this second interview, Guzman was in police custody.

5

that the shaking was more vigorous than she had previously indicated. Guzman also claimed that Lily hit her head on Guzman's knee while Guzman was rocking her.

At trial, Dr. Roberts opined that Lily's injury could not have been caused by Guzman accidently bumping Lily's head on a dresser. Subdural hematomas, according to Dr. Roberts, are typically formed when there is a great amount of acceleration within the brain followed by a sudden deceleration. He testified that subdural hematomas can be caused by car accidents and falls from second-story windows. He opined that Lily's crawling or rolling into some object would simply not generate enough force to cause her injury.

Dr. Roberts further opined that Lily's injury happened "relatively quickly prior to arrival at [the] hospital." In his opinion, the injury could not have occurred six to eight hours prior to surgery; he testified that Lily would have died if her brain had bled for six to eight hours. Dr. Roberts also testified that he could not imagine that Lily would have eaten after sustaining her injury, noting that her symptoms would have arisen very quickly. Dr. Roberts concluded that the bruising on Lily's forehead was likely caused from coming into contact with a firm surface.

Almost two weeks after arriving at the hospital, Lily was admitted to hospice. She ultimately died a little less than a month after being admitted to the hospital.

Dr. Tasha Greenburg, a deputy medical examiner for the Tarrant County Medical Examiner's Office, performed an autopsy on Lily. Dr. Greenburg concluded that the cause of death was abusive head injury and that the manner of death was homicide. Dr. Greenburg opined that a time period of more than three hours between Lily's injury and arrival at the hospital was not consistent with Lily's injuries. The autopsy revealed that Lily had a buckle fracture of the left proximal tibia—near the lower portion of her leg as it met her knee. Dr. Greenburg testified that this fracture was probably caused by a pulling or twisting motion. The autopsy also revealed a small healing fracture on one of Lily's ribs, as well as a small hemorrhage on the back of Lily's neck in the muscles close to the cervical spine. Dr. Greenburg opined that the neck injury was consistent with a rotational movement. The autopsy further revealed that Lily experienced retinal hemorrhages. Dr. Roberts testified that retinal hemorrhages and buckle fractures of the tibia are co-injuries that sometimes accompany acceleration-deceleration events.

### III. SUFFICIENCY OF THE EVIDENCE

In two points, Guzman argues that the evidence is insufficient to support her conviction.

### A. Standard of Review

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential

7

elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Dobbs*, 434 S.W.3d at 170.

The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Dobbs*, 434 S.W.3d at 170. Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011); *see Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Dobbs*, 434 S.W.3d at 170.

## B. The Evidence is Sufficient to Support a Finding of Recklessness

In her first point, Guzman argues that the evidence is insufficient to support her conviction for recklessly causing serious bodily injury to a child because the evidence does not show that she consciously disregarded a risk.

8

To support a conviction for recklessly causing serious bodily injury to a child, the State must prove that a defendant, by act or omission, caused a child's serious bodily injury with the requisite criminal intent. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Under the penal code,

> A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

Tex. Penal Code Ann. § 6.03(c) (West 2011). In determining whether a defendant recklessly caused serious bodily injury to a child, a jury is entitled to consider the extent of the child's injuries, the relative size of the child compared to the defendant, and expert testimony that a severe trauma was the cause of the child's injuries. *Kelley v. State*, 187 S.W.3d 761, 764 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd).

Here, there is ample evidence that Guzman caused Lily's injury and that the injury was of such severity that Guzman had to have been aware of the substantial risk of her conduct but consciously chose to disregard it. Both Michelle and Guzman stated that Lily was acting normally when dropped off at Guzman's apartment, and Guzman told Corporal Miller that no one apart from herself had access to Lily once she was dropped off. Both Dr. Roberts and Dr. Greenburg opined that Lily's injury occurred shortly before admittance to the

9

hospital and that her injuries were not consistent with a timeframe that had the injury occurring prior to her arrival at Guzman's apartment.

Dr. Roberts opined that Lily's injuries were the result of an acceleration-deceleration event and that the amount of force necessary to cause such an event would be tremendous—such as a car accident or a fall from a second-story window. According to Dr. Roberts, Guzman's explanations for the cause of Lily's injury—that Lily bumped her head when left alone or that Guzman accidently bumped Lily's head on a dresser—were simply not plausible. Dr. Greenburg concluded that the cause of Lily's death was abusive head injury, and Dr. Greenburg noted that Lily experienced retinal hemorrhages and a fractured tibia—co-injuries that sometimes accompany acceleration-deceleration events.

Viewing this evidence in the light most favorable to the verdict, a rational juror could have found beyond a reasonable doubt that Guzman recklessly caused serious bodily injury to Lily. *See Kelley*, 187 S.W.3d at 764 ("From the expert testimony and the facts surrounding the event including the relative size and strength of the parties and the fact that appellant was alone with the baby, a rational juror could have found appellant was aware of, but consciously disregarded, the risk to the baby."). Moreover, the jury could have believed that Guzman's constantly evolving story as to how Lily was injured was evidence of her consciousness of guilt. *See King v. State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000) (noting that making false statements to cover up a crime is evidence indicating a consciousness of guilt and is admissible to prove the commission of

10

the offense); *Couchman v. State*, 3 S.W.3d 155, 164–65 (Tex. App.—Fort Worth 1999, pet. ref'd) (holding that defendant's changing story was evidence of consciousness of guilt). We overrule Guzman's first point.

### C. There is No Material Variance on Causality

In her second point, Guzman argues that the evidence is insufficient to support her conviction because of an alleged material variance on causality. Guzman contends that there is a variance in the manner and means that was alleged in the indictment and the proof demonstrated at trial. According to Guzman, the State was only able to prove one of two scenarios: 1) that her conduct was coupled with some other concurrent cause,[7] or 2) that she failed to seek medical care for Lily.

The State counters that specific proof of the manner and means was unnecessary as the manner and means of an assaultive offense is not an essential element. We agree with the State. Several courts have held that the manner and means of the bodily injury alleged is not an essential element of an assaultive offense and therefore is not included in the hypothetically correct jury charge. *Thomas v. State*, 303 S.W.3d 331, 333 (Tex. App.—El Paso 2009, no

---

[7]Guzman suggests that Lily's volatile father may have caused her injury at some point prior to Lily's arrival at Guzman's apartment. Guzman points to testimony from Lily's eight-year-old sister, Jennifer, that Lily's foot was shaking during her sleep the night before and morning of the injury. Dr. Roberts testified that an outward symptom of an already existing brain injury could be a rhythmic movement of a limb. Dr. Roberts was unequivocal, however, that Lily's injury did not occur prior to her arrival at Guzman's apartment.

pet.); *Rodriguez v. State*, 274 S.W.3d 760, 767 (Tex. App.—San Antonio 2008, no pet.); *Phelps v. State*, 999 S.W.2d 512, 516 (Tex. App.—Eastland 1999, pet. ref'd); *see also Stuhler v. State*, 218 S.W.3d 706, 718 (Tex. Crim. App. 2007) (holding that injury to a child is a "result of conduct" offense).[8] A variance between the manner and means alleged and the actual manner and means used does not preclude a conviction. *Thomas*, 303 S.W.3d at 333. Even though the State may include the manner and means in the indictment, it will be disregarded in a hypothetically correct jury charge. *See Johnson v. State*, 364 S.W.3d 292, 298 (Tex. Crim. App. 2012) (holding variance immaterial in aggravated assault case when indictment alleged that the defendant hit the victim and twisted her arm "with his hand" and evidence showed that the defendant threw the victim against a wall); *Thomas*, 303 S.W.3d at 333 (holding that variance in the manner and means alleged—striking the victim with the defendant's hand—and the actual manner and means used—pushing the victim—was immaterial); *Botello v. State*, No. 08-04-00127-CR, 2005 WL 2044667, at *2–3 (Tex. App.—El Paso Aug. 25, 2005, pet. ref'd) (not designated for publication) (holding that variance in the manner and means alleged—striking the victim's head against a door frame—and the actual manner and means used—pushing the victim—was immaterial); *Phelps*, 999 S.W.2d at 518 (holding that the fact that the State did

---

[8]We note that this court made the same holding in an unpublished opinion. *See Fritzching v. State*, No. 02-10-00431-CR, 2012 WL 1222033, at *4 (Tex. App.—Fort Worth Apr. 12, 2012, pet. ref'd) (mem. op., not designated for publication).

not present evidence of the manner and means alleged—striking the victim in the head with the defendant's hand—was immaterial where the hypothetically correct jury charge would not have included the descriptive phrase "with his hand").

Moreover, we cannot agree with Guzman's contention that the State proved only that Guzman's conduct was coupled with some other concurrent cause or that Guzman failed to seek medical care for Lily. As set forth above, the evidence demonstrated that Lily's injuries were caused by contact with a firm surface, and that such contact occurred at a time when only Guzman had access to Lily. That evidence is consistent with the manner and means alleged in the indictment that Guzman caused Lily's death by "striking her with or against a hard or soft surface." We overrule Guzman's second point.

## IV. CONCLUSION

Having overruled Guzman's two points, we affirm the trial court's judgment.

/s/ Sue Walker
SUE WALKER
JUSTICE

PANEL: DAUPHINOT, WALKER, and GABRIEL, JJ.

DAUPHINOT, J., concurs without opinion.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: October 29, 2015

13